In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-15-00150-CV
IN THE INTEREST OF J.S.

**On Appeal from the 279th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-221116**

## MEMORANDUM OPINION

Both J.C.S. (the Father) and E.L. (the Mother) appeal from the decree terminating their parental rights to J.S. (the Child).[1] The Father challenges the sufficiency of the evidence to support the trial court's termination findings, and the trial court's failure to timely appoint him an ad litem attorney. The Mother also challenges the sufficiency of the evidence to support the trial court's findings. We affirm the judgment of the trial court.

---

[1] To protect the identity of the minor, we have not used the actual name of the Child, parents, or other family members. *See* Tex. R. App. P. 9.8.

## I.     Background

### A.     The First Incident

Child Protective Services (CPS) has been involved with the Child since the day after the Child's birth on May 6, 2013. Susanne Jones, a CPS investigator, testified that CPS received a report that the Mother had tested positive for marijuana use during her pregnancy. Jones then met with the Mother at the home of the Child's maternal grandmother, where the Mother and the Child also resided. According to Jones, the Mother admitted to smoking marijuana two to three times a week during her pregnancy. Nevertheless, the Mother tested negative for marijuana use at the Child's birth. The Child's meconium test, however, was positive for prenatal marijuana exposure. Jones testified that both the Mother and the Father admitted to smoking marijuana although not around the children.[2] Jones determined the children were receiving appropriate care and residing in a clean and appropriate home. Jones concluded there was a reason to believe the Mother had physically abused the Child by exposing him prenatally to marijuana, but she determined removal was not necessary and closed the case in August of 2013.

---

[2] The Mother had another child residing with her at the beginning of this case, but the court granted conservatorship of that child to that child's father. Therefore, that child is not the subject of this appeal.

**B.      The Second Incident**

CPS assigned Jones to investigate this family again in April of 2014 after CPS received a report of neglectful supervision, possible sexual abuse, and domestic violence. By this time, the Mother had moved out of the maternal grandmother's home and into an apartment. Jones found the apartment to be clean and did not observe any apparent health or safety hazards. She noticed a hole in the wall, but the Father explained that it was there when they moved into the apartment. Jones found no evidence to substantiate sexual abuse, but she found evidence suggesting continued marijuana abuse. Based on her previous investigation, Jones knew that the parents knowingly engaged in unsuitable conduct for parents of young children and that they knew they presented a dangerous environment for the Child. She testified that the parents again admitted to her that they smoked marijuana two to three times a week, but they did so only after the children were asleep, which caused the parents to believe that their use of marijuana did not impair their ability to care for the children. Jones again spoke to the parents about not using marijuana. Jones testified that after the first incident, she had referred the Mother to some outpatient classes, but the Mother did not go to the classes.

Jones asked the parents whether there was domestic violence in the home and explained to the parents that domestic violence created a dangerous environment for the Child. The parents denied any domestic violence, and Jones found no evidence of domestic violence in the home.

At the time of her investigation, the Mother was employed. The Father was unemployed, but he cared for the Child while the Mother worked outside the home. CPS determined the children were not in danger and removal was not necessary.

## C. The Third Incident

On May 26, 2014, an officer received instructions from dispatch to check on the welfare of the Child at the hospital. The Child arrived at the hospital with a fractured and deeply-lacerated nose and a serious injury to his left eye. The officer spoke with the Father, who told the officer that the Child sustained the injury while playing with his older half-brother. According to the officer, the Father's story did not account for the substantial injuries the Child had received. When the officer informed the Father that the Child would possibly lose his eye, the Father "became visibly irate and enraged." The Father confronted the Mother, berating her and yelling profanities at her regarding the incident. After the Father calmed down, he changed his story and told the officer that the Mother injured the Child when she threw a wooden chess box at the Father. The Mother admitted to throwing the

4

chess box, but she claimed she threw the box at the Father because the Father had been assaulting her and she wanted to prevent another assault. With the exception of some possible swelling under the Mother's eye, the officer did not observe injuries consistent with the Mother's description of the assault. Similarly, the officer did not observe any defensive injuries on the Father.

The parents informed another officer that was assisting with the investigation that the argument developed when the Father saw a text message conversation between the Mother and the Child's maternal grandmother about the Father's obligation to provide for his family. The Mother's explanation to this officer of how she injured the Child was consistent with what she had described to the first.

The second officer investigated the apartment where the parents claimed the incident occurred. The parents told him that the Mother resided in the apartment and the Father stayed there frequently as well, but he resided elsewhere. The officer found that the apartment had a "very bad smell to it[,]" "was very messy[,]" and had "very, very little food[.]" According to the officer, the apartment did not have running water, and, as a result, the upstairs toilet was full of feces and there was urine in the bathtub. The apartment had electricity but only one working lightbulb. The officer saw what he believed to be marijuana lying in plain sight in

the kitchen.[3] He also noted that the upstairs of the apartment had very little furniture, most notably, no beds for the children. What is more, there were clothes covering the floor. He noted that someone had torn up one of the doors to an upstairs bedroom. The trial court admitted a photograph of the door into evidence. The photograph depicts a cracked door with two massive holes in the center. The lower hole in the door appears large enough for a small child to fit through it. In the officer's opinion, the condition in which he found the apartment was consistent with the allegation that domestic violence had occurred in the home.

CPS received notification of the incident involving the Child. CPS assigned Jones to the family's case and asked her to determine the Child's medical needs in light of his new injuries and to find appropriate placement for him. Jones testified that from the beginning of the investigation, the Mother maintained the same explanation of the Child's injuries—i.e., the Mother accidentally injured the Child while defending herself from the Father's physical abuse.

## D. Termination of Parental Rights

CPS removed the Child from the parents on May 27, 2014. The same day, the Texas Department of Family and Protective Services (the Department) filed a

---

[3] The officer testified that he did not have the substance he found in the kitchen tested, but based on his extensive experience investigating crimes involving marijuana and drug paraphernalia used to smoke marijuana, he believed the substance to be marijuana.

6

petition for temporary managing conservatorship of the Child or, alternatively, permanent managing conservatorship and termination of the parent-child relationship between the Mother, the Father, and the Child. The trial court named the Department temporary sole managing conservator and ultimately placed the Child with relatives in June 2014. After a bench trial, the court terminated the Father and the Mother's parental rights to the Child. The parents have appealed the trial court's judgment.

## II.    Burden of Proof and Standards of Review

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Due in part to the severity and finality of the involuntary termination of parental rights, the evidence in support of termination must be clear and convincing. *See In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002); *Holick*, 685 S.W.2d at 20; Tex. Fam. Code Ann. § 161.001(1), (2) (West 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). The clear and convincing standard is an intermediate standard, which falls between the preponderance of the evidence burden applicable in ordinary civil proceedings and

7

the reasonable doubt burden applied in criminal proceedings. *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth, pet. denied) (op. on reh'g) (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). Thus, the State's proof must be more than merely the greater weight of the credible evidence, but it need not be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In evaluating the legal sufficiency of the evidence, we examine all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *J.F.C.*, 96 S.W.3d at 266. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, we do not disregard undisputed facts that do not support the trial court's finding. *Id.* We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the "'sole arbiter when assessing the credibility and demeanor of witnesses[.]'" *Id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005)).

In evaluating the factual sufficiency of the evidence, we examine the entire record to determine whether "the disputed evidence that a reasonable factfinder

8

could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" about the trial court's finding. *J.F.C.*, 96 S.W.3d at 266. If the evidence that could not be credited in favor of the finding is so great that it would prevent a reasonable factfinder from forming a firm belief or conviction that the statutory requirements have been met, the evidence is factually insufficient. *Id.*

### III.  Predicate Termination Grounds

The Father and the Mother challenge the legal and factual sufficiency of the evidence to support the predicate termination grounds. Regarding the Father, the trial court found two predicate grounds for termination—subsections D and E. Regarding the Mother, the trial court found three predicate grounds for termination—subsections D, E, and R. Section 161.001(1) provides in relevant part that termination of parental rights is warranted if the trial court finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
> . . .

9

(R) been the cause of the child being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription[.]

Tex. Fam. Code Ann. § 161.001(1)(D),(E) & (R). Only one predicate finding under section 161.001(1) is necessary to support an order of termination when the court also finds that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the termination order if the evidence is both legally and factually sufficient to support any statutory ground on which the trial court relied in terminating parental rights, and to support the best interest finding. *See In re E.A.G.*, 373 S.W.3d 129, 141 (Tex. App.—San Antonio 2012, pet. denied).

Subsection 161.001(1)(E) permits termination when clear and convincing evidence shows that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(1)(E). "'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary

10

that the conduct be directed at the child or that the child actually suffers injury." *Id*. (quoting *Boyd*, 727 S.W.2d at 533).

Under subsection E, the evidence must show the endangerment was the direct result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). We examine the parent's conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125. Because illegal drug use exposes a child to the possibility that the parent may be impaired or imprisoned, the use of illegal drugs may support termination under subsection 161.001(E). *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied).

Domestic violence may constitute endangerment, even when not directed at the child. *See J.O.A.*, 283 S.W.3d at 346 (holding that evidence of domestic violence may support an endangerment finding, even if the violence is not directed at the child); *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet.

denied) ("Domestic violence may be considered evidence of endangerment. If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.") (citation omitted); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. Domestic violence, want of [self-control], and propensity for violence may be considered as evidence of endangerment.") (citation omitted).

From our review of the record, we conclude the evidence supports the trial court's endangerment findings under subsection E for the Father and the Mother. Here, the CPS investigator testified that a major concern was the parents' resistance to change. Not only is there testimonial evidence that the Mother admitted to using marijuana during her pregnancy, but also the Child's meconium test results provided objective proof of the Child's prenatal exposure to marijuana. The evidence presented at trial supports that the Child's prenatal exposure to drugs presented a danger to the Child's physical and emotional well-being. The trial court also heard evidence that the parents continued to use drugs throughout the Child's life even after CPS informed them they needed to stop. In fact, the Father's testimony indicates that he smoked marijuana the night the Child was injured.

12

While the Father claimed that he has not smoked marijuana since the night the Child was injured, the trial court could have disbelieved this claim especially in light of the Father's long history of drug abuse.

Besides the parents' continuous drug use, domestic violence was also shown to have occurred in the home, culminating in the third incident of May 26, 2014. We acknowledge that the parents' dispute a history of domestic violence. We note the parents' respective versions of the events the night the Child was injured differ drastically. As explained above, the Mother claims that the Father was assaulting her and the Child was inadvertently injured while she attempted to protect herself. According to the Father, the day before the incident he and the Mother had argued, so he took the Child to his mother's house to spend the night. He returned the next day in an effort to fix his relationship with the Mother. He explained that he became angry when he found out that the Child's maternal grandmother refused to help them and had been critical of his ability to provide for the family. The Father denied assaulting the Mother, but he admitted there was some pushing during the argument and that they had "tussled" over the phone. He testified that when he turned his back, the Mother threw something at him and then he heard the Child cry. He admitted that after the Child was injured, he pushed the Mother out of the way because he was angry. The Father later claimed that he did not really "push"

the Mother. Instead, he claims he was just trying to keep her away from the Child and used a "stiff arm[.]"

Regardless of who started the fight between the Mother and the Father, the evidence supports that the parents allowed their volatile relationship and abusive behavior toward one another to escalate to the point where the Child suffered severe injury. Evidence in the record reflects that CPS warned the parents that they could inadvertently injure the Child during one of their violent disputes. The Father admitted that his interactions with the Mother had become physical on at least one other occasion before the day the Child was injured. The evidence at trial supports that the violence in the home presented a danger to the Child's emotional and physical well-being.

The Child's maternal grandmother testified that while the Child was in the Mother's care, the Mother was very attentive and protective of the Child. The grandmother testified that before the last incident involving the Child, the Mother had never told the grandmother that the Father was abusive, and had not appeared afraid of the Father. The grandmother believes the Mother could be a responsible and loving mother for the Child.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the trial court, as the factfinder, is the sole arbiter of

the witnesses' credibility and demeanor, we hold there is clear and convincing evidence on which a reasonable factfinder could have formed a firm belief or conviction that the Mother and the Father had engaged in conduct or knowingly placed the Child with persons who engaged in a conscious course of conduct that endangered the physical or emotional well-being of the Child. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.F.C.*, 96 S.W.3d at 266. While the Father and the grandmother may have offered some controverting or explanatory evidence, the trial court was free to disbelieve that testimony. Furthermore, based on our review of the entire record, we conclude that the evidence is sufficient for the trial court to have formed a firm belief or conviction about the truth of the allegations against the Mother and the Father. We conclude that the evidence is legally and factually sufficient to support the trial court's findings under section 161.001(1)(E).

We overrule the Father's third issue and the Mother's first issue as it relates to the trial court's finding under subsection E.[4]

---

[4] We need not address the sufficiency of the evidence to support a violation under subsections (1)(D) or (R). *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.— Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights."). We therefore overrule the Father's second issue about subsection (D) and the Mother's first issue about subsection (D) and her second issue as to subsection (R).

15

## IV. Best Interest of the Child

The trial court found that termination was in the Child's best interest. Both the Father and the Mother contend the evidence is legally and factually insufficient to support this finding. In evaluating the best interest of the Child, we focus, necessarily, on the child, not the parents. *See In re R.F.*, 115 S.W.3d 804, 812 (Tex. App.—Dallas 2003, no pet.). We consider a non-exhaustive list of factors: (1) desires of the children; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b). In reviewing the trial court's decision to terminate a parent's relationship with a child, we consider that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). The party seeking termination need not prove that each *Holley* factor weighs in favor of

termination. *C.H.*, 89 S.W.3d at 27. A trial court's best interest finding "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm[,]" but rather it "is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

In this case, the Child is too young to express his desires regarding the termination of his parents' rights. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.)("The young age of the child render[s] consideration of the child's desires neutral.").

The Mother and the Father have a history of drug abuse. The Mother used marijuana while pregnant with the Child and continued to use drugs after the Child's birth. The Father admitted to smoking marijuana off and on throughout the Child's life, including smoking marijuana the night the Child was injured. A parent's drug use supports a finding that termination is in the best interest of the children. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). Because drug-related conduct is a significant factor, the factfinder can give great weight to that evidence when present. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.).

The Mother and the Father also have a history of domestic violence. There was evidence that their issues were not isolated to one event, but rather the parents had a problem that existed over time. The trial court heard testimony and saw photographic evidence that the home in which the parents resided was in a condition consistent with this violence.

The trial court heard evidence that the Mother and the Father allowed the Child to reside in a home that exhibited unsafe living conditions. While there was some evidence that the Father did not actually live in the apartment, the Father testified that he had slept at the apartment every night since the Mother had moved in and was constantly at the apartment. According to the Father, the apartment was not normally in the condition in which the officers had found it that night. He claimed that they were in the process of moving the Mother back to the grandmother's house, which explains why there was no running water. The Father testified that they were no longer residing in the apartment and would only go to the apartment to "chill." However, the grandmother's testimony does not support the Father's claim that they were in the process of moving back into the grandmother's house in May 2014. Rather, the grandmother testified that the Mother had only been living with her since September 2014.

According to the Child's grandmother, the Mother made sure the Child had food and appropriate clothing. She testified that when she visited the apartment, there was enough food in the home and there was running water. However, the grandmother recalled that the Mother told her the water had been turned off a few days before the incident. Regardless, the grandmother claimed the Child was not in danger in the apartment.

Because of the injuries the Child received the night of the incident, the Child's eye had to be removed. The evidence in the record reflects that the Child has special future medical needs, and that he will require special fittings for a prosthetic eye at various points in his life. The Child also has a heart murmur and suffers with upper respiratory issues, which may be linked to the Mother's prenatal marijuana use.

The parents contend that they can meet the Child's needs. However, at the time of trial, the Father remained unemployed and had not procured independent living arrangements. The CPS investigator testified that the Father had convictions for indecency with a child, trespassing, and possession of marijuana. Because of his indecency with a child conviction, the Father must register as a sex offender. The Father testified that his criminal background has somewhat hindered him from

obtaining employment. To his credit, the Father had appropriate monthly family visits with the Child and only missed two visits.

Although the Mother had a pending criminal charge for the Child's injuries, she had not gone to trial at the time of the final hearing and the Mother had no other criminal history. Because of the Mother's bond conditions in the criminal case, CPS was not allowed to let the Mother visit the Child during the pendency of this case. To her credit, the Mother was employed at the time of the final hearing. However, the Mother had been unable to obtain independent living arrangements. Except possibly providing a few gifts at Christmas, the parents have not provided financial support to help care for the Child. According to CPS, the parents did not provide CPS with anything to show that their respective homes were safe or that their situation had otherwise improved.

The Father denied that CPS ever told him he should attend parenting classes, have a psychological exam, or attend anger management courses. He testified that if CPS had told him he needed to do those things, he would have tried to complete them even if it meant paying for the items on his own. The Father testified he has never had a chance to be a father to the Child.

However, according to the CPS investigator, the parents have failed to take responsibility for their part in causing the injuries to the Child. The evidence

supports that the parents remained unconvinced that the environment they created placed the Child in danger. Even though CPS had warned the parents more than once to stop using marijuana, the parents continued to do so. Even though CPS informed the parents that an environment of domestic violence was unsafe for the Child, the parents remained involved in the volatile relationship. There is evidence that CPS informed the parents that they could seek help for their drug abuse and domestic violence issues, but the parents did not seek help. In fact, according to the CPS investigator, during CPS's involvement with this family, the parents' drug use and domestic violence issues worsened. Based on the parents' behavior and attitudes, CPS determined that a family service plan for reunification would be ineffective and CPS could not work with the parents.

The trial court, as the factfinder, could infer that the parents' future conduct could be measured by their past conduct. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("A fact finder in a termination case may permissibly infer that a parent's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation."). Here, as explained above, the parents have demonstrated continuous drug abuse, domestic violence, and allowed the Child to remain in unsafe living conditions.

21

In contrast, the evidence reflects very favorably on the foster parents' abilities to care for and meet the Child's needs. As of April 21, 2015, the date of the final hearing, the Child had resided with the foster family since June of 2014. The evidence admitted at trial indicates that the foster family was very happy and anxious to have the Child with them. The evidence showed there was a strong bond and mutual love between the Child and the foster parents. The trial court heard evidence that the Child's foster family provided him with a stable home and that they were willing and able to continue to provide and care for him. The CPS conservatorship worker testified that the Child's foster family is the best place for him and it is in the Child's best interests for the parents' rights to be terminated and the foster family be allowed to adopt him. The CASA representative testified that she had visited the Child at the foster family's home and the Child was very happy and well adjusted. She testified that the home is "full of love."

Viewing the evidence in the light most favorable to the best interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination was in the best interest of the Child. Based on our review of the entire record, we further conclude that the trial court could have reasonably formed a firm belief or conviction that it would be in the best interest of the Child for the Father and the Mother's parental rights to be terminated. The

evidence is both legally and factually sufficient to support the best interest finding. We overrule the Father's first issue and the Mother's third issue each challenging the trial court's best interest finding.

## V. Appointment of Counsel

The Father contends the trial court erred in not timely appointing him counsel under section 107.013 of the Texas Family Code. *See* Tex. Fam. Code Ann. § 107.013. The trial court must appoint an attorney ad litem to represent the interests of an indigent parent who responds in opposition to a suit filed by a governmental entity in which the State requests termination of the parent-child relationship. *Id*. § 107.013(a)(1). Section 107.013(d) requires that "[a] parent who claims indigence under Subsection (a) must file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section." *Id*. § 107.013(d); *see* Tex. R. Civ. P. 145(b) (describing requirements and contents of affidavit of indigency). Section 107.013 contains no specific timetable for appointment an attorney ad litem to represent the parent's interests. *See In re V.L.B.*, 445 S.W.3d 802, 807 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also In re M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). However, the parent's filing of an affidavit of indigency triggers the trial

court's duty to appoint an attorney ad litem for an indigent parent. *V.L.B.*, 445 S.W.3d at 805-06. If a parent claims indigence and requests the appointment of an attorney at a status hearing or any permanency hearing held after the date the court renders temporary orders, the trial court shall require the parent to complete and file with the court an affidavit of indigence. Tex. Fam. Code Ann. § 263.0061(a), (b). The trial court may, but is not required to, conduct a hearing to determine whether the parent is indigent. *Id*. § 263.0061(b).

The trial court held a status hearing on July 22, 2014, in which the parents appeared pro se. The CPS supervisor testified that the Department's family plan of service was for a relative to adopt the Child, with a concurrent plan for relative conservatorship. The parents disagreed with the Department's plan. The trial court explained to the parents that if they were in opposition to the Department's plan to terminate their rights and have a family member adopt the Child, that they had a right to an attorney and that if they could not afford an attorney, one would be appointed for them. The Father indicated that he understood the trial court's explanation and while he wanted an attorney, he could not afford one. The trial court then asked the Father a series of questions and determined the Father was not indigent.

The trial court held a permanency hearing on March 10, 2015. The Father appeared pro se. During this hearing, the Father informed the trial court that he was not able to afford counsel and needed the court to appoint him counsel. After questioning the Father about his financial resources available at that time, the trial court appointed counsel to represent the Father. The trial court then informed the Father's newly-appointed counsel of the date of the final hearing and indicated he was unlikely to move the hearing date. The trial court then admonished the Father to stay in touch with his appointed attorney and work with her to get ready for the final hearing. Neither the Father nor his appointed counsel objected to the appointment as being untimely or otherwise indicated that they would be unable to prepare adequately for trial.

On April 14, 2015, the trial court held a hearing to consider the Mother's motion for continuance. The Department argued that it was in the Child's best interest to proceed to trial. The Father's counsel indicated that she had no objection to proceeding to the final hearing as set. The trial court denied the Mother's request for a continuance. The trial court held the final hearing in this case on April 21, 2015. Before the final hearing began, the Mother re-urged her motion for continuance. At this point, for the first time, the Father's counsel asked for a continuance on the basis that the Father had not had an opportunity to work with

CPS. The Father's counsel argued that the Father did not know what to do with the service plan because he was not represented by counsel. The trial court denied the Mother and the Father's request for a continuance. On April 23, 2015, the Father filed a motion for the extension of the dismissal date in this case.

The trial court denied the Father's initial request for a court-appointed attorney ad litem. However, the trial court granted the Father's second request and appointed the Father an attorney ad litem on March 10, 2015. The record does not reflect that the Father ever filed an affidavit of indigence as required by section 107.013. Thus, the Father failed to properly initiate the process for which his appointment of counsel would become mandatory. *See V.L.B.*, 445 S.W.3d at 805-06.

Although the Father never filed the appropriate paperwork claiming indigence, he asks this Court to determine whether the March 10, 2015 appointment was untimely. The Father claims he suffered irreparable harm from the late appointment, but he does not explain what harm he suffered. He claims the outcome of his case might have been different, but he does not explain in his brief how or why the outcome would have been different had the court appointed him counsel earlier in the case. The Father does not assert that his counsel was unprepared or otherwise rendered ineffective assistance of counsel due to the

timing of the appointment. In fact, at various points before trial, the Father's counsel indicated she had no objection with the current trial setting. We conclude the record does not reflect that error, if any, in the timing of counsel's appointment probably led to the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). We overrule the Father's fourth issue.

Having overruled all of the Father and the Mother's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on July 7, 2015
Opinion Delivered October 1, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.

27